IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DEBORAH D. KLEIN : CIVIL ACTION
:
v. : No. 08-3798
:
DOUGLAS M. WEIDNER, et al. :

**MEMORANDUM**

**Juan R. Sánchez, J.** February 17, 2010

    Plaintiff Deborah Klein (Klein) is a creditor and the ex-wife of Defendant Douglas Weidner (Weidner). In Count One of her Amended Complaint, Klein asserts Weidner's transfer of a parcel of real estate, located at 1123 Saint Matthews Road, Chester Springs, Pennsylvania, 19425 (the Property), to himself and his current wife, Defendant Kathleen Weidner, as tenants by the entireties, was fraudulent under the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa. C.S. § 5101 *et seq.* (PUFTA). In Count Two, Klein asserts Weidner's transfer of an ownership interest in Defendant DMW Marine, LLC (DMW), to Kathleen Weidner and himself, as joint owners, was fraudulent under PUFTA.[1] In Count Three, Klein asks this Court to pierce DMW's corporate veil and treat DMW's assets as Weidner's so that Klein may look to DMW's assets for satisfaction of her judgment.

    Weidner's mother, Jean Weidner, asserted a cross-claim against Weidner, alleging her sale

---

[1] In Count Two of her Amended Complaint, Klein sought to void all fraudulent transfers of assets from Weidner to DMW, his mother, Jean Weidner, and/or any unknown individual. At trial, however, Klein limited the scope of her requested recovery to Weidner's transfer of an ownership interest in DMW to Kathleen Weidner.

1

of the Property to Weidner was procured by fraud, duress, and undue influence.[2] Jean Weidner seeks reformation of the contract price and compensatory damages for expenses occurred in defending against Klein's action.

By Memorandum and Order of January 6, 2010, this Court granted Klein's summary judgment motion as to Count One, concluding Weidner's transfer of the Property, to himself and his wife, as tenants by the entireties, was fraudulent under §§ 5104(a)(1), 5104(a)(2), and 5105 of PUFTA. The Court denied Klein's summary judgment motion as to the remaining counts.

A bench trial of Klein's remaining claims and Jean Weidner's claims was held on January 11-13, 2010.

**FINDINGS OF FACT**

1. Klein and Weidner divorced in California in 1999.
2. As part of the divorce decree, the Superior Court of Orange County, California (Superior Court), ordered Weidner to make spousal and child support payments to Klein. Weidner made some child support payments but has paid no spousal support to date.
3. On January 1, 2006, Weidner married Kathleen Weidner.
4. After litigation between Klein and Weidner with respect to how much Weidner owed, on June 2, 2008, the Superior Court determined Weidner owed Klein $548,797.07 for unpaid child and spousal support.
5. On August 25, 2008, the $548,797.07 judgment against Weidner, in favor of Klein, was entered in the Chester County Court of Common Pleas.

---

[2] Klein named Jean Weidner as a Defendant, but, on May 29, 2009, dismissed all claims against her.

6. At all times relevant to the instant matter, Weidner and Kathleen Weidner were aware of Klein's claim Weidner owed her arrearages for spousal and child support.

7. On March 17, 2005, Weidner purchased a parcel of real estate, located at 1123 Saint Matthews Road, Chester Springs, Pennsylvania, 19425 (the Property), from his mother, Jean Weidner, for $300,000. The purchase price was paid in an advance on inheritance of $75,000 from Jean Weidner to Weidner, and a mortgage and note in which Weidner arranged to pay the remaining $225,000 to Jean Weidner.

8. On January 17, 2006, Weidner transferred the Property to himself and his wife, Kathleen Weidner, as tenants by the entireties.

9. The Transfer of Deed states Kathleen Weidner paid Weidner one dollar as consideration for her interest in the Property.

10. On March 31, 2006, the Property was appraised at approximately $750,000.

11. Kathleen Weidner paid over $300,000 to contractors for renovations to the Property. Such payments began approximately ten months after the Property's transfer, and they were made directly to contractors, not to Weidner.

12. On January 4, 2010, the Weidners granted a $200,000 mortgage against the Property to Robert Bendix. They filed this mortgage on January 12, 2010, the day the parties expected trial in this case to be completed.

13. The mortgage bears the signatures of both Weidner and Kathleen Weidner. Weidner asserted his Fifth Amendment privilege against self-incrimination at trial when asked about the preparation of the mortgage.

14. Kathleen Weidner testified she did not sign the January 4, 2010 mortgage.

15. The Court draws an adverse inference against Weidner based upon his assertion of his Fifth Amendment privilege and concludes Weidner participated in the forgery of his wife's signature on the January 4, 2010 mortgage.

16. DMW sells and leases marine cranes. DMW has continuously operated in Pennsylvania since 2003.

17. DMW produced no evidence, either through discovery or at trial, that corporate formalities are observed or that by-laws or other rules to govern its operation have been adopted.

18. At deposition, Weidner testified that, shortly after January 1, 2006, he transferred his ownership interest in DMW Marine, LLC, to himself and his wife, as joint owners.

19. A third party, Jake DuPont, subsequently purchased a 10% ownership interest in DMW for $250,000.

20. Kathleen Weidner testified at trial she owned either 85% or 90% of DMW jointly with Weidner.

21. When asked for her title with DMW, Kathleen Weidner replied she was the Vice President. When confronted with her deposition response that she was the CEO, she explained her job duties had not changed and, because DMW is small, her job title is irrelevant.

22. Schedule K-1 (K-1) forms are used to report income from certain business entities, including limited liability companies such as DMW, to the federal government.

23. When Klein requested records reflecting ownership interests in DMW during discovery, Defendants failed to produce K-1 forms.

24. Shortly before trial, Defendants produced K-1 forms for both Weidner and Kathleen Weidner for 2006-2008. The forms do not indicate on what date they were prepared.

25. Neither Weidner nor Kathleen Weidner filed tax returns with these K-1 forms. Neither has filed a federal tax return since 2006.

26. Kathleen Weidner testified she had never seen the K-1 forms produced at trial.

27. The most recent K-1 form produced by Defendants, for 2008, shows Kathleen Weidner has a 46% ownership interest in DMW. Kathleen Weidner testified she was never told her ownership interest was 46%.

28. The Court finds the K-1 forms are not credible evidence of ownership interests in DMW for the following reasons: Defendants failed to produce the forms during discovery, the forms were produced on the eve of trial, the forms do not indicate when they were prepared, the forms are inconsistent with Weidner's deposition testimony that after he transferred his interest in DMW, he and Kathleen Weidner owned the business jointly, and they are inconsistent with Kathleen Weidner's trial testimony that she owned 85-90% of the business jointly with Weidner.

29. The Court credits Weidner's deposition testimony and Kathleen Weidner's trial testimony and finds, in January 2006, Weidner transferred his DMW ownership interest to himself and Kathleen Weidner, as joint owners.

30. Kathleen Weidner made two payments to DMW, totaling $165,000. Both payments were booked by DMW as loans, and DMW subsequently made payments to Kathleen Weidner in the amount of $173,070.47.

31. Kathleen Weidner's additional transfers of $16,000 and $100,000, cited by the Weidners as payments for her interest in DMW, were from her personal bank account into bank accounts she shared with Weidner. There is no evidence these payments were intended as payments

for her interest in DMW. The Court heard no evidence Kathleen Weidner paid Weidner for such interest.

32. The Court therefore finds Kathleen Weidner paid nothing for her ownership interest in DMW.

33. The Weidners routinely use DMW accounts to pay for various personal expenses, including Weidner's child support payments to Klein.[3]

34. Ninety percent of payments for renovations of the Weidners' home were made by DMW. The only portion of the house which was not renovated was the wing that, at the time, housed DMW's offices.

35. DMW pays the entirety of Kathleen Weidner's monthly American Express bill, which includes business and personal expenses.

36. Weidner does not receive cash distributions for his interest in DMW. Rather, he pays personal expenses from DMW and he testified he accounts for such payments as distributions at the year's end.

37. Weidner told Jeffrey Lewis, the general contractor who renovated the Weidners' home, that Weidner had to be careful with his money so Klein could not attach any liens against his assets.

38. Weidner repeatedly told his niece, Sherry Tuski, that he had to title assets in his wife's name so Klein would be unable to reach them.

39. In a November 2001 e-mail to Klein, Weidner stated he would never pay her another cent.

---

[3] Klein has thoroughly documented DMW's payment of the Weidners' personal expenses, both through trial testimony and at Plaintiff's Exhibits 15A-15L.

40. In February 2005, Weidner's attorney wrote Klein's counsel, stating, "I have been informed by Mr. Weidner that his assets that do exist have been protected in such a way that while the children will be provided for, it will be impossible for [Klein] to recover any of the court ordered arrearages." Pl.'s Ex. 6. The Court finds Weidner's testimony that he was neither aware of nor authorized this statement is not credible.

41. After Klein opposed Weidner's attempt to modify his support payments in September 2005, Weidner filed a frivolous lawsuit against Klein in December 2005, alleging she had stolen a horse. He voluntarily dismissed the lawsuit three months later.

42. Weidner sent several e-mails to his children, copied to Klein, in which he denigrated Klein for her attempts to collect her debt, and he also threatened to withdraw his financial support for them as a result of Klein's attempts to collect payment.

43. After Klein filed the instant suit, Kathleen Weidner sent an e-mail to certain alumni of the college which she and Klein both attended, disparaging Klein and the instant suit. Weidner subsequently e-mailed Klein, threatening to e-mail the same alumni with highly inflammatory allegations about Klein if she did not drop her attempts to collect her judgment from him.

44. Weidner has sent several messages to Klein's counsel, attacking their personal and professional integrity for representation of Klein in this matter and threatening to sue counsel for such representation.

45. In addition to threatening legal action, Weidner also implicitly threatened the safety and security of one of Klein's attorneys. Together with a faxed transmission of documents related to the instant matter, Weidner faxed a copy of an e-mail from himself to Kathleen

Weidner, with the subject line "reference file for private detective." Pl.'s Ex. 38B. The body of the e-mail contained the name of one of Klein's attorneys and his home address, estimated age, and spouse's name.

46. Weidner has thoroughly demonstrated by his words and conduct his intent to prevent Klein from collecting her debt from him.

47. On March 17, 2005, Jean Weidner sold the Property to Douglas Weidner in exchange for a $75,000 advance on his inheritance and a $225,000 mortgage.

48. The sale was accomplished by execution of a mortgage, deed, and note, all of which were prepared by Weidner's attorney, Patrick Kurtas.

49. The execution of these documents took place at the Property, which was Jean Weidner's home at the time. Kurtas, Weidner, and Jean Weidner were present.

50. Jean Weidner was 77 years old at the time of the transaction.

51. At the time of the transaction, Weidner held a power of attorney for Jean Weidner and generally assisted her with financial matters.

52. Jean Weidner was unrepresented by counsel in connection with the transaction.

53. Kurtas spent 30-45 minutes with Jean Weidner, reviewing each of the three documents paragraph by paragraph and asking questions to make sure Jean Weidner understood what the transaction entailed and what her rights were under the agreements.

54. Kurtas explained he was Weidner's attorney and told Jean Weidner she was under no obligation to sign the documents, she could contact anyone she wished for assistance, and she could ask any questions. He did not specifically advise her she could secure her own counsel.

55. In conducting the transaction, Kurtas took into consideration Jean Weidner's age, but he believed she understood the information he conveyed about the transaction and believed she was competent to make the sale.

56. Prior to the sale of the Property to Weidner, Jean Weider sold two parcels of real estate, with the advice of Weidner and a real estate agent, but unassisted by counsel.

57. Jean Weidner testified she did not recall discussing the sale price of the Property either before or during the transaction, but on cross-examination, she testified she was satisfied with the $300,00 purchase price.

58. After the sale, Jean Weidner moved from the Property due to renovations taking place at the time.

59. Jean Weidner testified she never returned to the Property because she did not feel wanted there and because she wanted more privacy than was available to her at the Property.

**DISCUSSION**

Klein asserts Weidner's transfer of an ownership interest in DMW to Kathleen Weidner was a fraudulent transfer under PUFTA. PUFTA creates several categories of fraudulent transfer. First, a debtor's transfer is fraudulent, regardless of whether the creditor's claim arose before or after the transfer, if the debtor transferred "with actual intent to hinder, delay or defraud any creditor of the debtor." 12 Pa. C.S. § 5104(a)(1). Second, a debtor's transfer is also fraudulent as to present and future creditors if the debtor made the transfer:

> without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

9

>   (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

§ 5104(a)(2). Third, a debtor's transfer is fraudulent as to present creditors only "if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer . . . ." § 5105.

PUFTA is silent as to the burden of proof to be applied to PUFTA claims, and Pennsylvania courts have not addressed the level of proof required in PUFTA fraudulent transfer actions. *Fidelity Bond & Mortgage Co. v. Brand*, 371 B.R. 708, 716 (E.D. Pa. 2007). Courts have consistently applied a preponderance of the evidence standard to constructive fraudulent transfer claims under PUFTA. *In re Dolata*, 306 B.R. 97, 117 n.2 (Bankr. W.D. Pa. 2004). There is some authority, however, which suggests clear and convincing evidence is the appropriate standard for actual fraudulent transfer claims under PUFTA. *Id.* at 117.

As an initial matter, the Court need not decide whether Klein must prove actual fraudulent transfer under PUFTA by clear and convincing evidence or by a preponderance of the evidence because Weidner's transfer of the DMW ownership interest was actually fraudulent under either measure. PUFTA sets forth eleven factors the Court may consider when determining whether a transfer was made with actual fraudulent intent, and Weidner's transfer of the DMW ownership interest satisfies several such factors. First, the transfer was "to an insider." § 5104(b)(1); *see In re DelCorso*, 382 B.R. 240, 259 (Bankr. E.D. Pa. 2007) (concluding transfer of property from debtor to debtor and debtor's husband, as tenants by the entireties, was a transfer to an "insider" within the meaning of PUFTA). Second, Weidner "retained possession or control of the property transferred

after the transfer" because Kathleen Weidner's testimony made clear she has no real authority at DMW. § 5104(b)(2). Her testimony demonstrated she was unsure of her job title and uncertain about the percentage of her ownership interest. She further testified she has never filed any federal tax return reporting an ownership interest in DMW. Third, by producing fabricated K-1 forms at the eleventh hour, Weidner attempted to conceal the transfer by misrepresenting its nature. § 5104(b)(3). Fourth, "before the transfer was made . . . , the debtor had been sued or threatened with suit." § 5104(b)(4). Weidner and Klein were involved in litigation regarding his support payments prior to the transfer.

A fifth factor used to determine actual intent to defraud is whether the value of consideration received by Weidner was "reasonably equivalent to the value of the asset transferred." § 5104(b)(8). The Weidners assert Kathleen Weidner made several payments for her interest in DMW. However, payments she made directly to DMW were booked as loans and repaid by DMW with interest. Other payments she claims she made for her interest in DMW were merely transfers from her bank account to bank accounts she held jointly with Weidner, and the Weidners present no evidence these payments were intended or used as capital contributions to DMW. Therefore, Kathleen Weidner did not pay "reasonably equivalent" value for her interest in DMW.

The sixth factor assessed to determine actual fraudulent intent is whether the transfer was made while the debtor "was insolvent or [the debtor] became insolvent shortly after the transfer was made." § 5104(b)(9). PUFTA defines a debtor as insolvent when "the sum of the debtor's debts is greater than all of the debtor's assets." § 5102(a). In January 2006, in addition to the transfer of the DMW ownership interest, Weidner transferred his interest in the Property to himself and Kathleen Weidner, as tenants by the entireties. Weidner testified he held no assets in only his name after those

two transfers. At this time, Weidner owed Klein thousands of dollars in support arrearages, such that his debt exceeded his assets. He was therefore insolvent or became insolvent shortly after transferring his interest in DMW.

In addition, Weidner has consistently and repeatedly demonstrated his intent to frustrate Klein's efforts to collect her debt in any way possible. From November 2001, when Weidner told Klein he would never pay her another cent, and up through the eve of trial, when he took out another mortgage against the Property, an asset which was the subject of one of the fraudulent transfer claims in this case, Weidner's words and actions have thoroughly evidenced his intent to frustrate Klein's efforts to collect her debt. He specifically told others, including Lewis, Tuski, and even, through counsel, Klein, that he manages his assets in such a way as to prevent them from becoming available to satisfy Klein's judgment. The Court concludes, given this direct evidence of fraudulent intent, considered along with the PUFTA factors set forth above, Weidner's transfer of an ownership interest in DMW to himself and Kathleen Weidner, as joint owners, was an actual fraudulent transfer under § 5104(a)(1).

Klein has also proved Weidner's transfer of the DMW ownership interest to himself and Kathleen Weidner, as joint owners, satisfies the constructive transfer sections of PUFTA. First, Klein has shown Weidner transferred an interest in DMW "without receiving a reasonably equivalent value in exchange." § 5104(a)(2). Second, Weidner's transfer of the DMW ownership interest and contemporaneous transfer of the Property rendered him insolvent, and thus, knowing he owed Klein for arrearages, Weidner "believed or reasonably should have believed that [he] would incur, debts beyond [his] ability to pay as they became due" when he transferred his DMW ownership interest. *Id.*

Finally, Weidner's transfer also satisfies § 5105 of the PUFTA, which applies only to present creditors. Klein was a present creditor of Weidner's at the time of the transfer because her "claim arose before the transfer was made." § 5105. PUFTA defines claim as "[a] right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." § 5101. Klein was thus a present creditor under PUFTA because, though she did not receive a formal judgment until 2008, she had a valid claim against Weidner for unpaid support when the DMW interest was transferred. Under § 5105, a transfer is fraudulent "if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer . . . ." *Id.* As discussed earlier, Klein has established Weidner did not receive reasonably equivalent value in exchange for the DMW ownership interest and he became insolvent as a result of such transfer and contemporaneous transfer of the Property.

In the third count of her Amended Complaint, Klein asserts Weidner treats DMW as his alter ego, and therefore asks this Court to pierce the corporate veil so she may collect from DMW to satisfy her judgment against Weidner. "There is a strong presumption in Pennsylvania against piercing the corporate veil." *Lumax Indus., Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995). Courts should pierce only in "specific, unusual circumstances." *Id.* "Nevertheless, a court will not hesitate to treat as identical the corporation and the individuals owning all its stocks and assets whenever justice and public policy demand . . . ." *Advanced Tel. Sys., Inc. v. Com-Net Prof'l Mobile Radio, LLC*, 846 A.2d 1264, 1278 (Pa. Super. Ct. 2004) (citation and internal quotation marks omitted); *see also Zubik v. Zubik*, 384 F.2d 267, 272 (3d Cir. 1967) ("[T]he appropriate occasion for disregarding

13

the corporate existence occurs when the court must prevent fraud, illegality, or injustice . . . .").

There is "no clear test or well settled rule in Pennsylvania" regarding when a court may pierce the corporate veil. *Advanced Tel.*, 846 A.2d at 1278 (citation and internal quotation marks omitted). Courts typically consider the following factors: "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetrate a fraud." *Lumax*, 669 A.2d at 895 (citation omitted). In a traditional piercing claim, a plaintiff seeks to pierce the corporate veil to reach the assets of a corporation's owner. Klein asks this Court to reverse-pierce because she seeks to treat DMW's assets as Weidner's assets for the purpose of collecting her judgment against Weidner. Reverse-piercing, where a plaintiff seeks to treat the assets of an organization as those of an individual, is recognized in Pennsylvania. *See In re Mass*, 178 B.R. 626, 627 (Bankr. M.D. Pa. 1995).

Klein's claim is somewhat unusual in that she seeks to pierce the veil of a limited liability company (LLC), not a corporation. A Committee Comment to Pennsylvania's LLC statute, 15 Pa. C.S. § 8904, states, however: "It is expected, for example, that in the appropriate case the doctrine of piercing the corporate veil will be applied to a limited liability company." *See also Engle v. Matrix Golf & Hosp. Phila., LLC*, No. 08-5831, 2009 WL 880680, at *3-4 (E.D. Pa. Mar. 31, 2009) (denying corporate and individual defendants' motion to dismiss, holding they could be held liable under an alter ego theory where the plaintiff alleged the defendant LLC, which allegedly had breached a contract with the plaintiff, was the alter ego of the moving defendants); *In re LMcD, LLC*, 405 B.R. 555, 560 (Bankr. M.D. Pa. 2009) (relying on Committee Comment to § 8904 to conclude "equitable remedy of 'piercing' is available regarding an LLC").

Klein demonstrated DMW does not observe corporate formalities, however, unlike corporations, LLCs need not observe many formalities. *See Advanced Tel.*, 846 A.2d at 1272 (noting with approval the trial court's conclusion the LLC at issue "adhered to the appropriate formalities for a limited liability company, which are few") (internal quotation marks omitted). In *In re LMcD*, the court noted corporate formality and record-keeping requirements are "less stringent" for LLCs, though LLC members are "still required to adhere to some formalities in running a limited liability company." 405 B.R. at 561. In concluding the LLC at issue had complied with such formalities, the court focused on the fact the LLC had "well documented its fundamental dealings with the government." *Id.* In this case, Klein has shown the Weidners have been remiss in filing the appropriate tax returns, but she has not otherwise demonstrated DMW's operation failed to conform with laws governing LLCs.

Rather, the thrust of Klein's argument is that equity demands piercing in this case because Weidner is using the LLC form to perpetrate an injustice, namely, to shield his assets from Klein's attempts to collect her judgment. As discussed earlier, Klein has thoroughly documented Weidner's expression of his intent to manipulate his assets in such a manner as to prevent Klein from reaching them. Klein has further demonstrated the Weidners routinely use DMW accounts to pay for personal expenses. *See In re Mass*, 178 B.R. at 630 (reverse-piercing the corporate veil where "[a]t all times the debtors used the proceeds of the business as if they were the assets of the individuals themselves"). The Weidners may legitimately account for this use of business assets for tax purposes – though the Court notes neither Weidner nor Kathleen Weidner has filed a tax return in the last three years – however, this practice effectively prevents Klein from collecting her debt because it keeps assets out of Weidner's name, as he admitted most or all of his salary and/or

dividends remain in DMW's accounts. DMW's assets should be treated as Weidner's assets in the unique circumstances of this case, where DMW observed no formalities, its assets were routinely and overwhelmingly used to pay personal expenses, and the stated intention of the controlling member was to hide his assets from a judgment.

Jean Weidner brings cross-claims against Weidner, alleging her sale of the Property to him was procured through fraud, duress, and undue influence.[4] Jean Weidner claims she sold Weidner the Property with his promise she would be permitted to continue residing at the Property. She also claims she entered into the sale transaction under duress and with Weidner's undue influence.

The elements of fraud under Pennsylvania law are "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Overall v. Univ. of Pa.*, 412 F.3d 492, 498 (3d Cir. 2005) (quoting *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994)). Jean Weidner alleges Weidner misrepresented that she could continue residing at the Property after she sold it. Weidner agreed he promised Jean Weidner she could reside at the Property after the sale, but testified such promise was not a misrepresentation because she remains welcome to live there. Jean Weidner testified she no longer lived at the Property both because she did not feel welcome and because she wanted more privacy. Jean Weidner's testimony undermines her claim Weidner's promise was a misrepresentation, and her fraud claim thus fails

---

[4] Jean Weidner also asserts claims against Kathleen Weidner and DMW solely for indemnification in the event Jean Weidner was held liable to Klein. Because Klein has voluntarily dismissed all claims against Jean Weidner, the Court will enter judgment in favor of Kathleen Weidner and DMW on Jean Weidner's cross-claims against them.

16

because she failed to prove the existence of a misrepresentation.

Under Pennsylvania law, "[d]uress is defined as 'that degree of restraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or apprehension to overcome the mind of a person of ordinary firmness.'"[5] *Strickland v. Univ. of Scranton*, 700 A.2d 979, 986 (Pa. Super. Ct. 1997) (quoting *Carrier v. William Penn Broadcasting Co.*, 233 A.2d 519, 521 (Pa. 1967)). Jean Weidner testified she was apprehensive about asking Weidner questions about the sale of the Property because of his temper. There was no evidence, however, that Weidner placed Jean Weidner under any "degree of restraint or danger" to accomplish the transaction. *Strickland*, 700 A.2d at 986. Therefore, Jean Weidner's duress claim fails.

A contract is voidable if it is the result of undue influence of one contracting party upon another. *Loizos v. Mutual of Omaha Ins. Co.*, 326 A.2d 515, 517 (Pa. Super. Ct. 1974). Undue influence may arise where there is a confidential relationship between the contracting parties. A confidential relationship is "any relationship existing between the parties to a transaction wherein one of the parties is bound to act with the utmost good faith for the benefit of the other party and can take no advantage to himself from his acts relating to the interest of the other party." *Rebidas v. Murasko*, 677 A.2d 331, 334 (Pa. Super. Ct. 1996) (citation and internal quotation marks omitted). This relationship "is not limited to any particular association of the parties, but exists whenever one is in a position of advisor or counselor, whereby the other party, with reasonable confidence, trusts

---

[5] "The quality of firmness is assumed to exist in every person competent to contract unless it appears that by reason of old age or other sufficient cause he is weak or infirm . . . ." *Carrier*, 233 A.2d at 521. Though Jean Weidner was elderly at the time of the transaction, the Court concludes from her testimony and demeanor on the witness stand she is of "ordinary firmness" and was at the time of the Property's sale.

17

that person to act in good faith for the other's interest." *Id.* In this case, Jean Weidner has offered evidence that, at the time of the sale, there was a confidential relationship between herself and Weidner. At the time of the sale, she entrusted him with assisting her with financial transactions and he held her power of attorney. *See Weiherer v. Werley*, 221 A.2d 133, 136 (Pa. 1966) (concluding a confidential relationship existed where one party confided in another regarding financial matters and requested assistance with such matters, as evidenced by a power of attorney). Thus, at the time she sold him the Property, there was a confidential relationship between herself and Weidner.

"Once a confidential relationship is found to exist, the proponent of a contract must show by clear and convincing evidence that the contract was free, voluntary and an independent act of the other party, entered into with an understanding and knowledge of its nature, terms and consequences." *Rebidas*, 677 A.2d at 334 (citation and internal quotation marks omitted). Jean Weidner was competent to contract at the time of the Property's sale. Weidner's counsel, Kurtas, read the documents with her, paragraph by paragraph, and ensured she understood the terms of the sale, which were relatively simple. There is clear and convincing evidence that Jean Weidner freely and voluntarily entered into the sales transaction, understood its terms, and by her own testimony, was satisfied with the price term.

**CONCLUSIONS OF LAW**

1. Weidner's transfer of his ownership interest in DMW to himself and his wife, as joint owners, was both an actual and constructive fraudulent transfer under PUFTA §§ 5104(a)(1), 5104(a)(2), and 5105.

2. Weidner has improperly used the LLC form to perpetrate an injustice and therefore Klein

18

may reverse-pierce the corporate veil and treat DMW's assets as Weidner's assets for the purpose of collecting her judgment against Weidner.

3. Jean Weidner's fraud claim fails because she failed to prove the existence of a misrepresentation by Weidner.

4. Jean Weidner's duress claim fails because she failed to prove her sale of the Property was the result of Weidner restraining or endangering her.

5. Jean Weidner's undue influence claim fails because, though she and Weidner were in a confidential relationship at the time of her sale of the Property to him, Weidner has proved by clear and convincing evidence that Jean Weidner voluntarily undertook and understood the terms of the transaction.

An appropriate order follows.

BY THE COURT:

 /s/ Juan R. Sánchez
Juan R. Sánchez, J.
United States District Judge