IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| DEBORAH D. KLEIN | : | CIVIL ACTION |
|---|---|---|
| v. | : | No. 08-3798 |
| DOUGLAS M. WEIDNER, et al. | : | |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                                                                                    July 2, 2010

Plaintiff Deborah Klein (Klein) is a creditor and the ex-wife of Defendant Douglas Weidner (Weidner). In an amended complaint, Klein asserted Weidner's transfers of his interests in real property (the Property) and a business, Defendant DMW Marine, LLC (DMW), to himself and his wife, Defendant Kathleen Weidner, as tenants by the entireties, were actually and constructively fraudulent under the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa. C.S. § 5101, *et seq.* (PUFTA). Klein also sought to pierce the corporate veil to treat DMW's assets as Weidner's assets for the purpose of collecting the debt he owed her.

By Memorandum and Order of January 6, 2010, this Court granted Klein's summary judgment motion as to Count One, concluding Weidner's transfer of the Property to himself and his wife, as tenants by the entireties, was actually and constructively fraudulent under PUFTA §§ 5104(a)(1), 5104(a)(2), and 5105. A bench trial on Klein's remaining claims was held from January 11-13, 2010.[1] Following the trial, this Court granted judgment in favor of Klein on her two remaining counts. *See* Memorandum & Order of February 17, 2010. As to Count Two, the Court

---

[1] Jean Weidner's claims against Weidner were also tried during this time period. This Court disposed of these claims by its Memorandum and Order of February 17, 2010.

concluded Weidner's transfer of his ownership interest in DMW to himself and his wife, as joint owners, was both an actual and constructive fraudulent transfer under PUFTA §§ 5104(a)(1), 5104(a)(2), and 5105. As to Count Three, the Court concluded Weidner improperly used the LLC form to perpetrate an injustice and Klein was therefore entitled to reverse-pierce the corporate veil and treat DMW's assets as Weidner's assets for the purpose of collecting her judgment against Weidner. This Court appointed a receiver, Michael J. Antonoplos, to manage the operation of DMW and preserve its assets. *See* Orders of January 19, 2010, and February 17, 2010.

In her amended complaint and in her petition for attorneys' fees, Klein sought an award of punitive damages against the Weidners, jointly and severally, on her PUFTA claims.[2] By Order of February 18, 2010, the Court instructed the parties to brief the issue of punitive damages. Having reviewed each party's briefs and the trial record, this Court concludes Klein is entitled to punitive damages against Douglas Weidner only, in an amount equal to compensatory damages, $548,797.07.[3]

**FACTS**

1. Klein and Weidner divorced in California in 1999.
2. As part of the divorce decree, the Superior Court of Orange County, California, ordered Weidner to make spousal and child support payments to Klein. Weidner made some child support payments but has paid no spousal support to date.
3. On January 1, 2006, Weidner married Kathleen Weidner.

---

[2] In her petition for fees, Klein sought punitive damages equal to the amount of attorneys' fees Klein has expended in the instant litigation and in previous litigation attempting to recover arrearages from Weidner.

[3] The Court's factual findings are based solely on evidence introduced at trial.

4.  After litigation between Klein and Weidner with respect to how much Weidner owed, on June 2, 2008, the Superior Court determined Weidner owed Klein $548,797.07 for unpaid child and spousal support.

5.  On August 25, 2008, the $548,797.07 judgment against Weidner, in favor of Klein, was entered in the Chester County Court of Common Pleas.

6.  At all times relevant to the instant matter, Weidner and Kathleen Weidner were aware of Klein's claim that Weidner owed her arrearages for spousal and child support.

7.  On March 17, 2005, Weidner purchased a parcel of real estate, located at 1123 Saint Matthews Road, Chester Springs, Pennsylvania, 19425 (the Property), from his mother, Jean Weidner, for $300,000.

8.  On January 17, 2006, Weidner transferred the Property to himself and his wife, Kathleen Weidner, as tenants by the entireties.

9.  The Transfer of Deed states Kathleen Weidner paid Weidner one dollar as consideration for her interest in the Property.

10. On March 31, 2006, the Property was appraised at approximately $750,000.

11. Kathleen Weidner paid over $300,000 to contractors for renovations to the Property. Such payments began approximately ten months after the Property's transfer, and they were made directly to contractors, not to Weidner.

12. On January 4, 2010, the Weidners granted a $200,000 mortgage against the Property to Robert Bendix (the Mortgage). They filed the Mortgage on January 12, 2010, the day the parties expected trial in this case to be completed.

13. The Mortgage bears the signatures of both Weidner and Kathleen Weidner. Weidner

asserted his Fifth Amendment privilege against self-incrimination at trial when asked about the preparation of the Mortgage.

14. Kathleen Weidner testified she did not sign the Mortgage.

15. The Court draws an adverse inference against Weidner based upon his assertion of his Fifth Amendment privilege and concludes Weidner participated in the forgery of his wife's signature on the Mortgage.

16. DMW is a limited liability company that sells and leases marine cranes. DMW has continuously operated in Pennsylvania since 2003.

17. DMW produced no evidence, either through discovery or at trial, that corporate formalities are observed or that by-laws or other rules to govern its operation have been adopted.

18. At deposition, Weidner testified that, shortly after January 1, 2006, he transferred his ownership interest in DMW to himself and his wife as joint owners.

19. A third party, Jake DuPont, subsequently purchased a 10% ownership interest in DMW for $250,000.

20. Kathleen Weidner testified at trial she and Weidner jointly owned either 85% or 90% of DMW.

21. At trial, when asked for her title as an officer of DMW, Kathleen Weidner replied she was the Vice President. When confronted with her deposition response that she was the CEO, she explained her job duties had not changed and, because DMW is small, her job title is irrelevant.

22. Schedule K-1 (K-1) forms are used to report income from certain business entities, including limited liability companies such as DMW, to the federal government.

23. During discovery, when Klein requested records reflecting ownership interests in DMW, Defendants failed to produce K-1 forms.

24. Shortly before trial, Defendants produced K-1 forms for both Weidner and Kathleen Weidner for 2006-2008. The forms do not indicate when they were prepared.

25. Neither Weidner nor Kathleen Weidner filed tax returns on behalf of DMW attaching these K-1 forms.

26. Neither Weidner nor Kathleen Weidner has filed a federal tax return since 2006.

27. Kathleen Weidner testified she had never seen the K-1 forms her counsel produced at trial.

28. The most recent K-1 form produced by Defendants, for 2008, shows Kathleen Weidner has a 46% ownership interest in DMW. Kathleen Weidner testified she was never told her ownership interest was 46%.

29. The Court finds the K-1 forms are not credible evidence of ownership interests in DMW because Defendants failed to produce the forms during discovery, instead waiting until the eve of trial to produce them; the forms do not indicate when they were prepared; and they were never filed with the federal government. Furthermore, the forms are inconsistent with Weidner's deposition testimony that after he transferred his interest in DMW, he and Kathleen Weidner owned the business jointly, and they are inconsistent with Kathleen Weidner's trial testimony that she owned 85-90% of the business jointly with Weidner.

30. Weidner transferred his DMW ownership interest to himself and Kathleen Weidner, as joint owners in January 2006.[4]

---

[4] The Court credits Weidner's deposition testimony and Kathleen Weidner's trial testimony regarding the joint transfer of DMW.

31. Kathleen Weidner made two payments to DMW, totaling $165,000. Both payments were recorded in DMW's accounting records as loans, and DMW subsequently made payments to Kathleen Weidner in the amount of $173,070.47.

32. Kathleen Weidner's additional transfers of $16,000 and $100,000, cited by the Weidners as payments for her interest in DMW, were from her personal bank account into bank accounts she shared with Weidner. There is no documentary evidence these payments were intended as payments for her interest in DMW. The Court heard no evidence Kathleen Weidner paid Weidner for such interest.

33. The Court therefore finds Kathleen Weidner paid nothing for her ownership interest in DMW.

34. The Weidners routinely use DMW accounts to pay for various personal expenses, including Weidner's sporadic child support payments to Klein.[5]

35. Ninety percent of the payments for renovations of the Weidners' home were made by DMW. The only portion of the house which was not renovated was the wing that, at the time, housed DMW's offices.

36. DMW pays the entirety of Kathleen Weidner's monthly American Express bill, which includes business and personal expenses.

37. Weidner does not receive cash distributions for his interest in DMW. Rather, he pays his personal expenses from DMW and testified he accounts for such payments as distributions at the year's end.

---

[5] Klein has thoroughly documented DMW's payment of the Weidners' personal expenses, both through trial testimony and at Plaintiff's Exhibits 15A-15L.

38. Weidner told Jeffrey Lewis, the general contractor who renovated the Weidners' home, that Weidner had to be careful with his money so Klein could not attach any liens against his assets.

39. Weidner repeatedly told his niece, Sherry Tuski, that he had to title assets in his wife's name so Klein would be unable to reach them.

40. In a November 2001 e-mail to Klein, Weidner stated he would never pay her another cent.

41. In February 2005, Weidner's attorney wrote Klein's counsel, stating, "I have been informed by Mr. Weidner that his assets that do exist have been protected in such a way that while the children will be provided for, it will be impossible for [Klein] to recover any of the court ordered arrearages." Pl.'s Ex. 6. The Court finds Weidner's testimony that he was not aware of this statement, and did not authorize it, is not credible.

42. After Klein opposed Weidner's attempt to modify his support payments in September 2005, Weidner filed a frivolous lawsuit against Klein in December 2005, alleging she had stolen a horse. He voluntarily dismissed the lawsuit three months later.

43. Weidner sent several e-mails to his children, copied to Klein, in which he denigrated Klein for her attempts to collect her debt. He also threatened to withdraw his financial support for them as a result of Klein's attempts to collect payment.[6]

44. Weidner admitted at trial that the purpose of such e-mails – in particular, an e-mail sent to

---

[6] For example, on February 27, 2008, Weidner wrote an e-mail to his three children, Klein, and Klein's husband, with the subject line "your mother." Weidner wrote: "Your mother has hired another law firm to try to take everything away from me. . . . Since she has taken this action I will have to cease all cash gifts to you, all presents, all automobile assistance[,] all assistance with tuition and school. All cell phones will terminate today. . . . Until your mother stops this 7 year attack on me[,] I will not be able to give any of you anything."

his son Peter in which Weidner promised to hire a firm to follow, harass, and intimidate Klein – was to dissuade Klein from pursuing the instant action.[7]

45. After Klein filed the instant suit, Kathleen Weidner sent an e-mail to certain alumni of the college which she and Klein both attended, disparaging Klein and the instant suit. Weidner subsequently e-mailed Klein, threatening to e-mail the same alumni with highly inflammatory allegations about Klein's medical history if she did not drop her attempts to collect her judgment from him.

46. Weidner has sent several messages to Klein's counsel, attacking their personal and professional integrity for representation of Klein in this matter and threatening to sue counsel for such representation.

47. Weidner testified he intended to pursue legal action against Klein and her counsel for bringing the instant lawsuit and he reiterated such intent in a February 19, 2010 e-mail to the receiver.

48. In addition to threatening legal action, Weidner also implicitly threatened the safety and security of one of Klein's attorneys. On August 19, 2008, together with a faxed transmission of documents related to the instant matter, Weidner faxed a copy of an e-mail from himself to Kathleen Weidner, with the subject line "reference file for private detective." Pl.'s Ex. 38B. The body of the e-mail contained the name of one of Klein's attorneys and his home

---

[7] On February 15, 2009, Weidner wrote an e-mail to his son, Peter, Kathleen Weidner, Klein, and Klein's husband, stating, "Once this last lawsuit is over and I once again win – I am going to hire a firm that will follow - harass and intimidate your mother and Terry for the rest of their lives. That is what we call pay back."

address, estimated age, and spouse's name.[8]

49. Weidner has thoroughly demonstrated, through his words and conduct, that he intended to prevent Klein from collecting her debt from him, without regard to legal constraints.

**DISCUSSION**

Klein seeks punitive damages, asserting Weidner's actions were sufficiently outrageous to merit such an award. As an initial matter, this Court must determine whether punitive damages are available for violations of PUFTA. *See Kirkbride v. Lisbon Contractors, Inc.*, 555 A.2d 800, 802 (Pa. 1989) ("[P]unitive damages are an element of damages arising out of the initial cause of action . . . ."). Punitive damages are not explicitly authorized by PUFTA. Among other remedies, however, PUFTA permits courts to award "any other relief the circumstances may require." 12 Pa. C.S. § 5107(a)(3)(iii). Punitive damages are generally available in Pennsylvania against those who commit intentional fraud. *See Delahanty*, 464 A.2d at 1263 (noting, although a plaintiff must prove, in addition to fraud, that a defendant acted in a "wilful, malicious, wanton, reckless or oppressive" manner to obtain punitive damages, "it is difficult to picture a fact pattern which would support a finding of intentional fraud without providing proof of 'outrageous conduct' to support an award of punitive damages"). This principle is implicitly incorporated in PUFTA. *See* 12 Pa. C.S. § 5110 ("Unless displaced by the provisions of this chapter, the principles of law and equity, including . . . the law relating to fraud [and] misrepresentation . . . supplement its provisions."). This principle also applies equally in the domestic context. *See Hess v. Hess*, 580 A.2d 357 (Pa. Super. Ct. 1990)

---

[8] On the same day, Weidner sent a fax to the same lawyer, stating: "I will spend the time to find everything I can about you. Where you live, what you drive, what kind of coffee you drink . . . . Your career may also end as a result of this case. Fair warning. It this case goes to trial we will sue Drinker Biddle and you personally for bringing this worthless case to court and once again harassing me and my family."

(affirming an award of punitive damages where, as part of a divorce settlement, the defendant agreed to disclose the value of marital estate assets and contemporaneously negotiated the sale of two such assets at 200% of the value disclosed).

The Weidners argue punitive damages are unavailable under PUFTA because recovery under PUFTA is limited to those remedies established by the statute.[9] In support, the Weidners cite a general rule of statutory construction:

> In all cases where a remedy is provided or a duty is enjoined or anything is directed to be done by any statute, the directions of the statute shall be strictly pursued, and no penalty shall be inflicted, or anything done agreeably to the common law, in such cases, further than shall be necessary for carrying such statute into effect.

1 Pa. C.S. § 1504. Courts have relied on § 1504 in finding punitive damages unavailable in other contexts. *See, e.g.*, *Rankin v. City of Philadelphia*, 963 F. Supp. 463 (E.D. Pa. 1997) (concluding punitive damages are unavailable under the Pennsylvania Whistleblower Law); *Dep't of Pub. Welfare v. Portnoy*, 566 A.2d 336 (Pa. Cmwlth. Ct. 1989) (holding compensatory and punitive damages are unavailable against attorneys who violate a Pennsylvania statute requiring notification of tort damages recovered in medical malpractice suits).

Such cases are distinguishable from the instant case. The *Portnoy* court was unwilling to supply remedies against one group of culpable individuals (attorneys), where the Pennsylvania legislature had created a detailed scheme of criminal and civil penalties against other groups (medical providers and welfare recipients). 566 A.2d at 340. The *Rankin* court similarly concluded the Pennsylvania legislature had not intended punitive damages to be recoverable under the Whistleblower Law where the legislature had set forth a detailed, comprehensive list of available

---

[9] PUFTA sets forth statutory remedies, including avoidance of a fraudulent transfer and recovery of monetary damages. *See* 12 Pa. C.S. §§ 5107(a), 5108(b).

remedies, and punitive damages was not among them.[10]  963 F. Supp. at 478-79.  In this case, however, the Pennsylvania legislature targeted the fraudulent conduct of debtors, and, unlike the Whistleblower Law, included a catch-all remedies provision in PUFTA.  *See* 12 Pa. C.S. § 5107(a)(3)(iii) (permitting courts to award "any other relief the circumstances may require").

Moreover, courts sitting within this district have concluded punitive damages are available under PUFTA and the statute which preceded it.  *See State Farm Mut., Auto. Ins. Co. v. Tz'Doko V'Chesed of Klausenberg*, 543 F. Supp. 2d 424, 431-32 (E.D. Pa. 2008) (allowing the plaintiff's claim for punitive damages to proceed under PUFTA where the plaintiff alleged malicious conduct); *Shervin v. Liebersohn*, 200 B.R. 109, 112 (E.D. Pa. 1996) (affirming a punitive damages award under the Pennsylvania Fraudulent Conveyance Act, PUFTA's predecessor statute); *UGI Corp. v. Piccione*, No. 88-1125, 1997 WL 698011, at *8-9 (E.D. Pa. Nov. 5, 1997) (holding genuine issues of material fact remained as to whether the plaintiff was entitled to punitive damages on its fraudulent conveyance claims).  This Court also concludes recovery of punitive damages is appropriate where a plaintiff can show outrageous conduct coupled with a fraudulent transfer.

Having determined punitive damages are available for violations of PUFTA, this Court must determine whether they are warranted in the instant litigation.  Under Pennsylvania law, "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others."  *Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005) (citation and internal quotation marks omitted).  Punitive damages are warranted "only in cases

---

[10] The *Rankin* court's conclusion was later confirmed in dicta by the Pennsylvania Supreme Court. *See O'Rourke v. Commonwealth*, 778 A.2d 1194, 1202-03 (Pa. 2001) (noting punitive damages are unavailable under the Whistleblower Law).  There is no such authority controlling this Court's interpretation of PUFTA.

11

where the defendant's actions are so outrageous as to demonstrate willful, wanton, or reckless conduct." *Id.*

Punitive damages are awarded "to punish a tortfeasor and to deter him or others like him from similar conduct." *Hutchison*, 870 A.2d at 770. In determining punitive damages awards, fact-finders consider: "(1) the character of the act; (2) the nature and extent of the harm; and (3) the wealth of the defendant." *Kirkbride*, 555 A.2d at 803. "The degree of reprehensibility is the primary indicator of the reasonableness of a punitive damages award." *Reading Radio, Inc. v. Fink*, 833 A.2d 199, 214 (Pa. Super. Ct. 2003) (citation omitted). The intent of the defendant must be examined to determine whether the defendant acted with an "evil motive" or "reckless indifference to the rights of others." *Hutchison*, 870 A.2d at 770 (citation omitted); *see also id.* ("[W]hen assessing the propriety of the imposition of punitive damages, the state of mind of the actor is vital.") (alteration, citation, and internal quotation marks omitted). Klein seeks punitive damages against both Douglas and Kathleen Weidner.

The Court will first address whether punitive damages are merited against Douglas Weidner and will first examine the reprehensibility of his conduct. The record in this case is replete with evidence of Douglas Weidner's intent to evade his support obligations, and, after they were reduced to a judgment, avoid paying such judgment. Douglas Weidner has expressly and repeatedly stated his intention to avoid paying his debt to Klein. He has attempted to insulate his assets to avoid repayment by fraudulently conveying interests in real property and his business, in violation of PUFTA. He structured his finances to avoid paying Klein. He repeatedly harassed Klein, both in and out of court, to discourage her from pursuing repayment of his debt to her. Just days before trial of the instant matter was set to commence, he forged his wife's signature on a loan intended to

12

encumber, and therefore reduce the value of, an asset which was the subject of one of Klein's fraudulent transfer claims. Weidner has even threatened Klein's counsel in an attempt to induce Klein's lawyers to abandon this case. Tellingly, the Weidners limit their response in opposition to Klein's application for punitive damages to legal arguments as to the availability of punitive damages under PUFTA. They offer no defense of Douglas Weidner's fraudulent and menacing behavior. This is the type of outrageous conduct which satisfies the first element of the punitive damages analysis.[11]

Second, the Court must consider the nature and extent of the harm to Klein. Weidner's conduct has caused ample financial harm. Klein asserts, in her application for punitive damages, she has spent $618,882.92 in litigation costs in pursuit of payment of Weidner's support obligations. Without addressing the accuracy of this specific figure, the Court notes it is not an improbable sum, given the many years Klein has spent litigating this matter in multiple fora. The Court concludes the financial harm in this case has been extensive and ongoing throughout a number of years.

Third, the Court must consider Douglas Weidner's wealth.[12] This is perhaps the closest

---

[11] Pennsylvania courts have considered less culpable conduct "outrageous" for the purpose of awarding punitive damages. In *Hess v. Hess*, 580 A.2d 357 (Pa. Super. Ct. 1990), a husband and wife agreed to a property settlement as part of their divorce. *Id.* at 358. The agreement required each spouse to make a complete and accurate disclosure of the value of the various properties which were part of the settlement. *Id.* The husband valued two properties at a combined $45,000, while, at the time of the execution of the settlement agreement, he was negotiating to sell the properties for $800,000. *Id.* The *Hess* court concluded "[t]his type of outrageous conduct can only be punished and deterred by punitive damages." *Id.* at 359. Similarly, in the instant matter, Weidner has repeatedly taken steps to fraudulently conceal his assets to prevent Klein from reaching them, and has gone even further, by harassing and attempting to intimidate Klein and her counsel into dropping the instant lawsuit.

[12] At least one Pennsylvania court has held a defendant's wealth need not be considered when deciding whether or not to award punitive damages; rather, it must be considered only when determining the amount of a punitive damages award. *See Vance v. 46 & 2, Inc.*, 920 A.2d 202, 207

question in the punitive damages inquiry, in part because Weidner has failed to file tax returns for the past few years and the Court found the K-1 forms submitted by the Weidners were not credible evidence. Nevertheless, there is record evidence to suggest Weidner is capable of paying a substantial punitive damages award. DMW has paid for more than $3.6 million in personal expenses. The Weidners also incurred more than $300,000 in personal American Express charges over a two-year period and spent nearly $1 million in home renovations. Weidner is the majority owner of a business which, by his own estimate, is worth more than $2 million. The Weidners offer no evidence to undercut the conclusion that Douglas Weidner is a wealthy individual. Thus, the Court concludes Weidner's wealth also weighs in favor of a punitive damages award.

The Court will next address whether punitive damages are warranted against Kathleen Weidner, looking first to the reprehensibility of her conduct. As the recipient of Douglas Weidner's interests in real Property and DMW, Kathleen Weidner has been complicit in two of the fraudulent transfers at the center of the instant litigation. On balance, however, the evidence does not show Kathleen Weidner acted with the same bad motive as Douglas Weidner. For example, although she wrote an e-mail to her fellow alumni disparaging Klein, it was Weidner who then threatened Klein with e-mailing the same alumni with inflammatory allegations if Klein did not drop the instant litigation. Similarly, Weidner forged his wife's name in his latest attempt to encumber the Property; Kathleen Weidner testified truthfully that she had not signed the promissory note. The content and manner of her testimony regarding her role at DMW leads this Court to conclude Kathleen Weidner

---

(Pa. Super. Ct. 2007) (holding punitive damages could be awarded where there was no record evidence of the defendant's wealth). As there is evidence of Weidner's wealth, the Court will consider Weidner's wealth along with the other factors of reprehensibility and harm inflicted by the defendant. *See Kirkbride*, 555 A.2d at 803.

plays only a limited role in DMW's affairs and has no management responsibilities. On balance, though she is not entirely blameless, the evidence does not show Kathleen Weidner's conduct was so outrageous as to warrant an award of punitive damages.

Having determined an award of punitive damages against Weidner is appropriate, the Court must now consider the proper amount of such an award. Klein seeks punitive damages in the amount of $618,882.92, which is the amount she asserts she has expended in litigation pursuing payment of Weidner's support obligations. The Weidners argue Klein's request for attorneys' fees is procedurally defective and, alternatively, seek an opportunity to challenge the reasonableness of such fees. Neither party's argument is persuasive. Punitive damages are not intended to compensate a party for attorneys' fees. Thus, the relevant question is not whether Klein is entitled to attorneys' fees or how much Klein has spent on attorneys' fees, but rather what amount fulfills the dual goals of punitive damages, punishing past conduct and deterring future offenses.

In awarding punitive damages, this Court must also consider the constitutional parameters of punitive damages awards. "The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). To determine the constitutionality of a punitive damages award, courts consider: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at 418.

The most important factor of these three is the reprehensibility element. *Id.* at 419. Analysis of reprehensibility for constitutional purposes requires a different test than the analysis required by

15

Pennsylvania law. To determine degree of reprehensibility for constitutional purposes, courts must consider whether "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* at 419. No single factor is dispositive. *Id.* In this case, there is no allegation of physical harm to Klein or disregard for her health or safety. There is also no direct evidence of Klein's financial vulnerability, though the Court notes Weidner's substantial arrearages in spousal and child support payments may be presumed to have created at least some financial hardship for Klein. Klein's financial status was further harmed by the necessity of spending a substantial sum on attorneys' fees in an attempt to collect the money owed to her.

The Third Circuit has concluded the repeated conduct factor has "less force where the defendant's misconduct did not extend beyond his dealings with the plaintiff." *CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 499 F.3d 184, 191 (3d Cir. 2007). Such repeated conduct, however, "may still be relevant in measuring the reprehensibility of the defendant's conduct, based on the particular facts and circumstances presented." *Id.*

In this case, there is no evidence Weidner has engaged in fraudulent behavior to avoid paying debts owed to creditors other than Klein. Weidner has, however, made repeated efforts to thwart Klein's collection of his debt to her, including the two fraudulent transfers and numerous attempts to discourage Klein from pursuing collection. In *Willow Inn, Inc. v. Public Service Mutual Insurance Co.*, 399 F.3d 224 (3d Cir. 2005), where an insurer engaged in a pattern of dilatory and obstructionist conduct to avoid paying an insured's legitimate claim, the Third Circuit concluded such a "pattern

16

of contemptible conduct within one extended transaction" is relevant to the extent it "implie[s] a concerted effort" to accomplish a nefarious purpose. *Id.* at 232-33. Similarly, Weidner has engaged in a pattern of fraudulent, obstructionist, threatening, and unlawful conduct designed to accomplish his stated purpose of avoiding the judgment entered against him. In addition,"[r]epeated misconduct is probative of reprehensibility when the tortfeasor knows or suspects that his pattern of behavior is unlawful." 499 F.3d at 191 n.3. In this case, Weidner was aware he owed Klein arrearages but nevertheless took repeated steps to conceal his assets and dissuade her from attempts to collect her debt. This is the type of repeated conduct which, although only directed at a single individual, is relevant to the reprehensibility analysis. In addition to his numerous attempts to force his Klein to drop her claim, Weidner repeatedly showed his contempt for the law, by forging a document and attempting through a variety of means to avoid his court-imposed judgment. This pattern of outrageous threats and willful violation of the law tilts this factor in favor of awarding punitive damages. *See CGB*, 499 F.3d at 191 (concluding the defendant's repeated actions were relevant to the repeated conduct factor where they "evinced not only an intent to damage [the plaintiff] but a willingness to act repeatedly on that intent, with utter contempt for [the plaintiff's] interests and disregard for the law").

The final factor the Court must consider to determine reprehensibility is whether Weidner acted with "intentional malice, trickery, or deceit" or whether his misconduct was "mere accident." *State Farm*, 538 U.S. at 419. After presiding over a bench trial in this case, the Court is uniquely positioned to assess Weidner's intent because it heard Weidner's testimony and had the opportunity to witness his demeanor. *See Willow Inn*, 399 F.3d at 230-31 (noting determination of an insurer's intent in delaying settling its insured's claim was "best made by the judge who heard the testimony

and observed the demeanor of all of the significant participants"). This Court concludes Weidner maliciously intended to fraudulently conceal all of his assets to unlawfully avoid paying his debt to Klein. Weidner intended the remainder of his dilatory and harassing actions, from filing a spurious lawsuit to forging his wife's name on a loan encumbering the Property, to prevent Klein from collecting the debt and to impede the enforcement of a court order. Thus, with strong evidence of malicious intent, evidence of repeated conduct, some evidence of financial harm to Klein, and no evidence of physical harm or reckless disregard for health or safety, the reprehensibility element weighs in favor of a significant, but not overwhelming, punitive damages award.

Next, the Court must consider the "disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award." *State Farm*, 538 U.S. at 419. There is no "mathematical bright line" separating constitutional punitive damages awards from those which are unconstitutional. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 583 (1996). The Supreme Court has, however, set forth a few principles to guide the disparity analysis. First, awards exceeding a single-digit ratio between punitive and compensatory damages are rarely constitutional. *Jurinko v. Med. Protective Co.*, 305 Fed. Appx. 13, 27 (3d Cir. 2008) (citing *State Farm*, 538 U.S. at 425). Second, such a ratio of 4:1 may be close to the constitutional maximum. *Id.* (citing *State Farm*, 538 U.S. at 425). Third, when compensatory damages are substantial, then a ratio approaching 1:1 may be the constitutional maximum. *Id.* (citing *State Farm*, 538 U.S. at 425). The Court must consider these guideposts when fashioning an award specific to Weidner's conduct and its effect on Klein. *See State Farm*, 538 U.S. at 425 ("The precise award in any case . . . must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.").

Finally, the Court must consider "the difference between the punitive damages awarded by

the jury and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418. This element "accord[s] substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue" and "provides notice of possible sanctions to potential violators." *Jurinko*, 305 Fed. Appx. at 29 (citation and internal quotation marks omitted). In this case, PUFTA authorizes avoidance of fraudulent transfers "to the extent necessary to satisfy the creditor's claim" and allows courts to grant "any other relief the circumstances may require." 12 Pa. C.S. § 5107(a). Thus, though PUFTA generally limits the amount recoverable to the amount of the debt owed a creditor-plaintiff, prospective violators also have notice of potential liability for unspecified relief required by the circumstances.[13]

Having considered Pennsylvania law governing punitive damages and the constitutional constraints, this Court concludes an appropriate award of punitive damages in this case is one equal to compensatory damages, or $548,797.07. This award adequately addresses the reprehensibility of Weidner's behavior, particularly his malicious intent and repeated misconduct, limits the punitive damages award in light of the substantial compensatory damages award, and comports with the open-ended penalty set forth in PUFTA. This Court notes the facts of this case are extreme in that the defendant willfully defied a court order and used unlawful and threatening means to impede the judicial process. Not every PUFTA case will contain such conduct beyond a single fraudulent transfer.

---

[13] Although courts agree punitive damages are available under PUFTA, this case is the first in which a court has had to determine the amount of such an award. Therefore, there are no comparable cases, under PUFTA, to which this Court might look. The Court thus affords this element lesser weight. *See Willow Inn*, 399 F.3d at 237-38 (noting uncertainty as to proper application of the comparison guidepost); *Parexel Int'l Corp. v. Feliciano*, No. 04-3798, 2008 WL 5101642, at *7-8 (E.D. Pa. Dec. 3, 2008) (considering only first two constitutional guideposts "[i]n light of the lack of comparable analogs").

**CONCLUSIONS OF LAW**

1.  Punitive damages may be awarded for violations of PUFTA.

2.  In this case, an award of punitive damages equal to compensatory damages satisfies the constitutional requirements set forth in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996) and *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003), and adequately satisfies the purposes of punitive damages, to deter future wrongful acts and punish past wrongful conduct.

An appropriate order follows.

BY THE COURT:

 /s/ Juan R. Sánchez
Juan R. Sánchez, J.
United States District Judge